

U.S. Department of Justice

United States Attorney
Eastern District of New York

FTB:EWS  
F. #2023R00287

271 Cadman Plaza East  
Brooklyn, New York 11201

August 22, 2025

By ECF & E-Mail

The Honorable Eric N. Vitaliano  
United States District Judge  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, New York 11201

   Re: United States v. Marcia Joseph  
     Criminal Docket 24-004 (ENV)

Dear Judge Vitaliano:

  The government respectfully submits this letter in advance of defendant Marcia Joseph's sentencing on August 29, 2025.

  This case concerns the defendant's abuse of her role as a senior fiscal officer for Charity-1, a non-profit organization based in Brooklyn that serves New York and New Jersey's economically disadvantaged. Instead of guarding Charity-1's funds, the defendant methodically stole them. For almost seventeen years, the defendant funneled nearly $2.4 million from Charity-1 to a shell company she set up. She perpetrated her scheme by generating invoices, submitting them to her colleagues, and manipulating Charity-1's electronic invoice system to ensure they bypassed senior members of the finance team. She then used the stolen funds to, among other purchases, pay for her mortgage, remodel her home, and buy tens of thousands of dollars' worth of goods off Amazon. Her crime cost Charity-1 millions. It imperiled the charity's vital relationships with donors and municipal partners. And it diverted precious time, attention, and resources away from Charity-1's critical mission.

  The defendant pleaded guilty to one count of wire fraud pursuant to a plea agreement, which reflected the parties' stipulation to a U.S. Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 33 to 41 months. The Guidelines range appropriately reflects the defendant's grave betrayal of her employer's trust. To serve the legitimate purposes of sentencing, including punishing the defendant for a serious offense, promoting respect for the law, and providing general deterrence, the Court should impose a Guidelines sentence.

I.        Background[1]

Marcia Joseph worked as a fiscal officer for Charity-1 for nearly twenty-five years, including as a senior fiscal officer for more than a decade. In that position, she approved payments to subcontractors and managed grant spending for Charity-1's workforce programs. She supervised multiple fiscal officers and reported to various accounting and finance executives.

The defendant betrayed the trust that Charity-1 placed in her. Between 2006 and 2023, she stole nearly $2.4 million by using a shell company she set up, Prestige Business Services ("Prestige"), that purported to be unaffiliated with Charity-1 and to provide specialized services in connection with certain service contracts between Charity-1 and New York city agencies. In truth, Prestige performed no work and was created and used by the defendant for the sole purpose of embezzling money from her employer. Over the course of years, the defendant generated and submitted more than 500 fictitious invoices, which described services that Prestige purportedly provided in connection with a New York City Department of Education ("DOE") educational program focusing on students in shelters and, later, job training for adults in shelters. The defendant then used her position as a fiscal officer to conceal her crime, including by entering inappropriate journal entries, manipulating Charity-1's spending practices and accrued expenses account, soliciting fake invoices from subcontractors, and causing invoices to be routed in the company's internal electronic system away from senior finance members.

In total, the defendant stole $2,339,700 from Charity-1 and funneled the money to a Prestige bank account. She then used the stolen money to pay for numerous personal expenses, including approximately $235,000 in mortgage payments, approximately $207,000 in credit card payments; approximately $98,000 in car payments, approximately $45,000 in Amazon expenses; and various other personal items, such as home remodeling, spa treatment, landscaping expenses, and luxury goods. She also withdrew nearly $100,000 in cash, disbursed approximately $16,000 to friends and family, and issued approximately $50,000 in checks in her own name, many of which were then deposited into her personal bank account.

Charity-1 first started to suspect the defendant in February 2023. After conducting an initial inquiry that uncovered suspicious information, Charity-1 retained a law firm and forensic investigation firm to conduct an internal investigation. Given the complexity and breadth of the defendant's criminal scheme, the investigation took several months, caused significant disruption at Charity-1, and cost the charity substantial legal fees. The defendant was interviewed twice by internal investigators. She initially denied all wrongdoing in her first interview. Days later, when she was re-interviewed and confronted with evidence of her embezzlement, the defendant admitted to it.

The defendant's crime caused significant harm. Apart from losing out on the considerable value of the stolen funds for the seventeen-year fraud,[2] Charity-1 incurred over $1.1

---

[1]        The following facts are derived from the Presentence Investigation Report ("PSR").

[2]        Charity-1's insurance company, Great American Insurance Group ("GAIG"), reimbursed nearly all the stolen funds (minus a $25,000 deductible). GAIG stands in the shoes

million in expenses arising from investigating and remediating the fraud—money that Charity-1 cannot recover under restitution. Lagos v. United States, 584 U.S. 577, 585 (2018). The defendant's crime can also be measured in lost opportunities for the population Charity-1 serves. As detailed in its victim impact statement, because Charity-1 pays $3,640 per person to serve participants in one of its occupational training programs, the defendant's fraud prevented the charity from serving 643 unemployed and underemployed individuals in need of those services. Charity-1 also suffered in other ways. Its employees diverted precious manpower away from its mission towards investigating the fraud and reviewing the defendant's work. Charity-1 engaged legal counsel to ensure proper reporting and disclosures were made. And the reservoir of trust that Charity-1 has amassed with its partners, philanthropists, government agencies, and everyday household donors—trust that is vitally important to a charitable organization—was put at risk by the defendant's crime.

On October 6, 2023, the defendant was charged in a one-count complaint with wire fraud, in violation of 18 U.S.C. § 1343. She was arrested on October 11, 2023, and has remained at liberty pursuant to agreed-upon conditions since her arrest. On January 19, 2024, upon the defendant's waiver of indictment, the government filed a single-count information charging the defendant with wire fraud. She pleaded guilty pursuant to a plea agreement.

II.     Applicable Law

The Supreme Court has explained that the Court "should begin all sentencing proceedings by correctly calculating the applicable range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted). Title 18, United States Code, Section 3553(a) provides, in part, that in imposing sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]
>
> (2) the need for the sentence imposed--
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

---

of the victim and is entitled to recover its losses on Charity-1's insurance claim. See 18 U.S.C. § 3664(j)(1) ("If a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation, but the restitution order shall provide that all restitution of victims required by the order be paid to the victims before any restitution is paid to such a provider of compensation.").

>> (B) to afford adequate deterrence to criminal conduct; [and]
>
>> (C) to protect the public from further crimes of the defendant.

Section 3553 also recognizes the need to afford the defendant opportunities for rehabilitation. See 18 U.S.C. § 3553(a)(2)(D). Thus, the Court must first calculate the correct Guidelines range and then apply the 3553(a) factors to arrive at an appropriate sentence. The district court must also "remain cognizant of them throughout the sentencing process." Gall, 552 U.S. at 50 n.6.

III.   Sentencing Guidelines

The following Guidelines calculation is set forth in the PSR:

| | | |
|---|---|---:|
| Base Offense Level (§ 2B1.1(a)(1)) | | 7 |
| Plus: | Intended Loss Exceeding $1,500,00 (§ 2B1.1(b)(1)(I)) | +16 |
| Plus: | Offenses Involving Misrepresentation that Defendant Acting on Behalf of Charitable, Educational, Religious, or Political Organization, or a Government Agency (§ 2B1.1(b)(9)(A)) | + 2 |
| Less: | Zero-Point Offender (§ 4C1.1) | –2 |
| Less: | Acceptance of Responsibility (§ 3E1.1) | <u>–3</u> |
| | Total: | <u>20</u> |

The total Adjusted Offense Level is 20, which, with a Criminal History Category of I, carries a Guidelines range of 33 to 41 months' imprisonment. The defendant stipulated to this Guidelines calculation.

IV.   Argument

The § 3553(a) factors weigh heavily in favor of a prison sentence within the Guidelines range. Such a sentence is sufficient but not greater than necessary to reflect the nature and circumstances of the offense, to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to adequately deter criminal conduct.

   A.   Seriousness of the Offense and the Need for Just Punishment

It is difficult to overstate the seriousness of the defendant's crime. See 18 U.S.C. § 3553(a)(1), (2)(A). Despite earning a steady income and amassing sizeable retirement benefits (PSR ¶¶ 58, 63), the defendant stole $2,339,700. That amount of money—money that should have gone to serving disadvantaged New Yorkers—speaks for itself. But several aggravating factors in this case call out for significant punishment.

First, the defendant's assertion that she has led a "law-abiding life . . . other than this financial crime" (Def.'s Br.[3] at 5) dramatically understates the nature and character of her criminal activity. Her conduct was not aberrational. She created and then submitted over 500 fictitious invoices for Charity-1's approval. Each of those instances was a separate choice by the defendant to commit a crime. The defendant could have stopped at any time. She did not. That she chose to continue stealing from her employer suggests she grew emboldened. Defendants often appear before district courts and ask for leniency because their conduct was aberrational—a one-time offense that is unlikely to be repeated. Here, the pattern of fraud repeated itself, year after year. Far from being exceptional, fraud was the rule that governed the defendant's life. The Court's sentence should reflect that a defendant engaged in a persistent, years-long theft is more culpable than an embezzler who steals a similar amount from her employer on few occasions for a short period of time.

Second, the defendant took elaborate steps to conceal her fraud, and she did so by abusing the knowledge and skills she developed at Charity-1. She set up a shell company. She manipulated Charity-1's general ledgers and spending and expense accounts—conduct that, by itself, could have profoundly affected the charity, even if no dollars were stolen. She solicited fake invoices. She routed Prestige invoices away from Charity-1 personnel who, like her, were entrusted with stewarding the charity's finances. And she lied when first confronted by company investigators. All of this conduct was doubly costly: it enabled the fraud to go on for as long as it did, and it caused Charity-1 to spend even more time and money unwinding the defendant's fraud. The Court's sentence should reflect the lengths to which the defendant went to perpetrate her scheme and betray the trust placed in her by her employer.

Third, the Court's sentence should account for the identity of the victim. The defendant did not just embezzle from any employer. She embezzled from a non-profit. Non-profits enjoy special status because of the public benefits they provide. They fill in critical gaps that government cannot cover on its own. Crimes like the defendant's against charities shake the public trust. As Charity-1 described in its victim impact statement, they have a chilling effect on donors, who may become reluctant to part with their money for fear that the next Marcia Joseph will steal it. Municipal dollars—money that Charity-1 relies on to operate—can dry up. And, as is obvious from Charity-1's victim impact statement, the defendant's crime harmed Charity-1 in numerous ways. After accounting for the legal, remediation, and other costs attendant to the crime, Charity-1 will never be made whole financially because those costs (some of which are difficult to quantify) are not compensable by restitution or insurance. Its employees did not benefit from the "several process improvement initiatives" that the company tried to implement because they were "deliberately undermin[ed]" by their disloyal colleague. (PSR ¶ 11.) And, had Charity-1

---

[3] The defendant has filed her sentencing submission and accompanying attachments under seal on the basis that they "discuss her private medical information." (Def.'s Br. at 1, n.1 (citing United States v. Amodeo, 71 F.3d 1044, 1049-51 (2d Cir. 1995)). While the defendant's submission discusses private medical information at various points (id. at 2-4, Ex. A), other parts do not at all relate to her private medical information. To ensure that Charity-1's representative(s) have an opportunity to be meaningfully heard at sentencing if they so choose, the government has asked defense counsel to publicly file a sentencing submission with narrowly tailored redactions as appropriate. Counsel has agreed to do so by August 26, 2025.

been able to make use of its stolen funds and the countless hours the defendant spent committing fraud instead of doing her job, the population Charity-1 serves—some of the region's neediest—could have benefited. Instead, the defendant lined her own pockets.

B. The Need to Promote Respect for the Law and to Provide Deterrence

A Guidelines sentence is also needed to advance the compelling need for general deterrence. As Courts in this Circuit have recognized, "[t]he need for general deterrence is particularly acute in the context of white-collar crime." United States v. Johnson, No. 16 Cr. 457 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018), vacated on other grounds, Johnson v. United States, 144 F.4th 133 (2d Cir. 2025); accord United States v. Stein, 09 Cr. 377, 2010 WL 678122, at *3 (E.D.N.Y. Feb. 25, 2010); United States v. Marsh, 2011 WL 5325410, at *1 (E.D.N.Y. Oct. 26, 2011) (noting people "choose to engage in white-collar crime because they believe that the potential for significant financial benefits outweighs the risk that they will be punished"); United States v. Emmenegger, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) ("[B]ecause many employee of financial institutions have the opportunity to commit similar offense, and likewise find themselves subject to the temptations of those who handle large sums of money, a reasonably substantial term of incarceration is also appropriate to deter others similarly situated"). Indeed, [c]onsiderations of [general] deterrence argue for punishing more heavily those offenses that are either lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it." United States v. Zukerman, 897 F.3d 423, 430 (2d Cir. 2018) (internal quotation marks and citation omitted); ); see also United States v. Cavera, 550 F.3d 180, 196 (2d Cir. 2008) (en banc) ("Where the profits to be made from violating a law are higher, the penalty needs to be correspondingly higher to achieve the same amount of deterrence.").

In the past, Congress has expressed a concern about the leniency sentencing judges have afforded white-collar criminals. See Mistretta v. United States, 488 U.S. 361, 375 n.9 (1989); Stephen Breyer, The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest, 17 Hofstra L. Rev. 1, 20-21 (1988). The concern is that a low sentence "undermines public confidence in whether the justice system is 'do[ing] equal right to the poor and to the rich.'" United States v. Hoffman, 901 F.3d 523, 556-57 (5th Cir. 2018) (quoting 28 U.S.C. § 453). "Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.'" United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (alteration in original) (quoting Stephanos Bibas, White-Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." Id.; see also Drago Francesco et al., The Deterrent Effects of Prison: Evidence from a Natural Experiment, 117 J. Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

Deterrence is particularly warranted given the documented increase in fraudulent conduct in recent years. See Jonathan R. Macey, Fraud in a Land of Plenty, 118 Nw. U. L. Rev. 227, 228 (2023) ("Fraud is on the rise. A recent survey of 1,296 executives in fifty-three countries revealed a rising threat of fraud. An astonishing 46% of surveyed organizations reported

experiencing fraud or related economic crimes over the past twenty-four months. Reports of consumer fraud, and 83% of organizations report phishing attacks." (footnotes omitted)). The need is even more acute than in the typical white-collar case. As set forth in the table below, embezzlement from charities from corporate insiders is a pervasive problem in this District and elsewhere in the region, which boasts a large number of charities.[4]

| Case Name | Defendant's Position | Duration of Fraud (Approx.) | Loss (Approx.) | Term of Imprisonment |
|---|---|---|---|---|
| United States v. Abboud, 16 Cr. 396 (ERK) (E.D.N.Y. Jan. 12, 2023) | Executive Director | 5 years | $1.3 million | 33 months |
| United States v. Shanley, 19 Cr. 383 (SHS) (S.D.N.Y. Jan. 16, 2020) | Treasurer | 7 years | $406,851 | 24 months |
| United States v. Murray, 23 Cr. 244 (PAE) (S.D.N.Y. Sept. 12, 2023) | Finance Director | 17 months | $488,177.24 | 18 months |
| United States v. Insaidoo, 16 Cr. 156 (VEC) (S.D.N.Y., Oct. 4, 2017) | Executive Director | 8 years | $580,000 | 48 months |
| United States v. Meakem, 21 Cr. 0061 (MPS) (D. Conn. Aug. 3, 2021) | CEO | 7 years | $683,202.09 | 24 months |
| United States v. Devine, 23 Cr. 136 (SRU) (D. Conn. Feb. 6, 2025) | Executive Director | 14 years | $397,064.93 | 24 months |
| United States v. Gileno, 19 Cr. 161 (VAB) (D. Conn. Nov. 13, 2019) | CEO | 2 years | $1.5 million | 1 year |
| United States v. Larivee, 19 Cr. 088 (GWC) (D. Vt. May 9, 2022) | Director of Grant Program | 4 years | $100,000 | 8 months |
| United States v. Van Vught, 23 Cr. 49 (CR) (D. Vt. July 2, 2024) | Accountant | 9 years | $558,625 | 27 months |
| United States v. Tucker, 17 Cr. 501 (CCC) (D.N.J. Apr. 18, 2018) | Executive Director | 3 years | $332,116 | 38 months |

---

[4] See, e.g., Fidelity Charitable, 2023 Geography of Giving: Dropping a Pin on the Local Pulse of American Philanthropy, available at https://www.fidelitycharitable.org/content/dam/fc-public/docs/insights/2023-geography-of-giving.pdf.

The defendant's argument that a Guidelines sentence would be inappropriate because of the loss amount table in U.S.S.G. § 2B1.1 (Def.'s Br. at 7-8) misses the mark. As the table above illustrates, the Guidelines in this case have yielded an eminently fair sentencing range—particularly given that the duration and amount of this defendant's crime exceeds each of frauds perpetrated by the defendants above. What's more, this table does not account for cases that were recently charged but have not yet resulted in convictions or sentences. Embezzlement from charities remains a problem to this day. See, e.g., United States v. Taylor, 24 Cr. 524 (JLR) (S.D.N.Y.) (founder and CEO of non-profit who embezzled $2.5 million in nine-year period pleaded guilty on August 18, 2025). The Court should impose a Guidelines sentence to avoid unwarranted sentencing disparities, 18 U.S.C. § 3553(a)(6), and send a clear message: stealing from charities will trigger significant punishment.

### C. A Non-Incarceratory Sentence Would Not Meet the Goals of Sentencing

The defendant advances several additional arguments for a non-incarceratory sentence. None justifies the extraordinary leniency she seeks.

The defendant first contends that the childhood and adult trauma she endured warrants a significant downward variance. (Def.'s Br. at 2-4.) The government does not dispute that this information may be considered under § 3553(a). But the defendant has not presented any persuasive evidence of a causal link between her mental-health ailments and the seventeen-year fraud she perpetrated. Those ailments simply cannot bear the full weight that the defendant places on them.

The defendant's other arguments for a non-incarceratory sentence are also unpersuasive. While the government credits the defendant's prompt guilty plea and what it says about her acceptance of responsibility (Def.'s Br. at 5), it is not atypical of white-collar offenders who are similarly situated to the defendant. Her Gudelines already account for acceptance of responsibility. And to the extent she seeks extra credit for waiving indictment and pleading guilty to an information, that fact should be weighed against the defendant's decision to initially lie to the company's investigators, which prolonged the revelation of the fraud and, in turn, the Office's investigation of her crime. The fact that the defendant may have supported her friends and family (id. at 5-6) is a circumstance common to many offenders and is not so extraordinary as to justify the free pass she seeks. The negative impact of the defendant's conviction on her job prospects (id. at 1, 5) is an unfortunate incident of the fraud that the defendant committed and in no way minimizes the real harm that she perpetrated on her employer. Finally, the need for the defendant to pay restitution and forfeiture (id. at 4-5) does not support a sentence of probation. The defendant's financial obligations are required by statute and the plea agreement she signed, and she should not receive any extra sentencing credit for shouldering responsibilities she is legally obligated to fulfill.

### V. Restitution

Pursuant to the Mandatory Victim Restitution Act, 18 U.S.C. §§ 3663A and 3664(j)(1), the government respectfully requests that the Court impose restitution for the harm

caused by the defendant in the amount of $2,339,700.  A proposed restitution order is enclosed for the Court's consideration.

## VI.     Forfeiture

As set forth in the defendant's plea agreement, the defendant has agreed to forfeit $2,339,700.  To date, the defendant has not forfeited any funds.  The government respectfully requests that the Court order the defendant to pay forfeiture in accordance with the preliminary order of forfeiture that was entered on August 21, 2025.  Dkt. No. 14.

## VII.    Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a term of imprisonment within the applicable Guidelines range.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:   /s/
Eric Silverberg
Assistant U.S. Attorney
(718) 254-6365

cc:   Clerk of the Court (ENV) (by ECF & E-Mail)
Kyla Wells, Esq. (by ECF & E-Mail)
Nicole Gervase, United States Probation Officer (by E-Mail)