# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

Tamara L. Giwa
*Executive Director*

Michelle A. Gelernt
*Attorney-in-Charge*

August 16, 2025

To Be Filed Under Seal[1]

By ECF and Email
The Honorable Eric N. Vitaliano
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re:  United States v. Marcia Joseph, Criminal Docket No. 24-CR-4 (ENV)

Dear Judge Vitaliano:

   I write in advance of Marcia Joseph's sentencing, which is scheduled for August 29, 2025. Ms. Joseph abused her position as a senior fiscal officer with the not-for-profit organization Goodwill Industries to defraud the company of approximately $2.3 million. Ms. Joseph admits and accepts responsibility for her actions. Accordingly, she immediately pled guilty to one count of wire fraud, in violation of 18 U.S.C. § 1343.

   Ms. Joseph's life has been rife with hardship and trauma.



   Moreover, because of her actions, Ms. Joseph has already suffered significant consequences. She lost her job with Goodwill after a nearly thirty-year career, along with the retirement benefits she would have otherwise received. Due to the nature of the instant offense, employers have been reluctant to hire Ms. Joseph, and she has been unable to find work. Legally and financially, Ms. Joseph's actions were wrong and self-destructive. Despite the financial hardships she has faced, Ms. Joseph has nevertheless promised to apply the funds in her

---

[1] Ms. Joseph respectfully requests that this letter and the attached psychological evaluation be filed under seal, as they discuss her private medical information. *See United States v. Amodeo*, 71 F.3d 1044, 1049–51 (2d Cir. 1995) (ruling that information may be sealed where its value to the public is outweighed by the privacy interests of the party seeking the sealing order).

retirement accounts, which exceed $700,0000, toward restitution. *See* Presentence Investigation Report ("PSR") at ¶ 63.

Indeed, by losing her job, its substantial benefits, retirement savings, and likely her home, which is subject to forfeiture, Ms. Joseph has already been economically punished for this economic crime. In addition, her family, who are deeply ashamed of her actions, have abandoned her, and her husband has promised to leave her when this case concludes. We respectfully submit that imprisonment on top of that is unnecessary to achieve the goals of sentencing. Rather, a probationary sentence will be sufficient. It is appropriate given Ms. Joseph's history of significant abuse and trauma, her low chance of recidivism, and the efforts she has made to make amends for her crime. It also credits her nearly two years' perfect compliance on pretrial release. We therefore ask that the Court sentence Ms. Joseph to a term of probation.

## I.     The Significant Trauma Ms. Joseph Suffered in Childhood and Adulthood Warrants a Downward Variance.

Ms. Joseph was born in 1966 in Linden, Guyana, to Leyland Lewis and Norma Abrams.





At age 18, Ms. Joseph obtained a job as an accountant. PSR ¶ 60; Ex. A at 5.

In 2021, Ms. Joseph married Bryan James, her first stable and healthy relationship. *Id.* at 6. However, since the presentence interview and psychological evaluation, their marriage has deteriorated. The stress and shame caused by the instant case have led to discussions of divorce. Although Mr. James plans on supporting Ms. Joseph for the duration of this case, he has promised to end the marriage upon its conclusion. This is yet another devastating blow in a life of relentless hardship.

Ms. Joseph's husband is not the only person to abandon her because of this case. Her family is deeply ashamed of her actions, and most of them refuse to speak to her.

The physical and emotional trauma that Ms. Joseph has endured is profound.



This case was a turning point in Ms. Joseph's life.

Ms. Joseph's life has been nothing short of tragic. We respectfully request that the Court heavily weigh the trauma she has experienced and the detrimental psychological impact incarceration will have in determining the appropriate sentence.

## II.     Ms. Joseph Has Suffered Significant Punishment to Date.

When Ms. Joseph was arrested, she was earning $101,000 per year as a senior fiscal officer with Goodwill Industries, a position she climbed the ladder to achieve over the course of a nearly thirty-year career with the company. PSR ¶ 58. In addition, Ms. Joseph had managed to set aside more than $700,000 in her 403(b) accounts for retirement. PSR ¶ 63. And with just a few more years of employment, she would have had significant security in retirement: health insurance and substantial savings.

Ms. Joseph lost all of that when she was arrested. She was fired and, as part of her plea agreement, has consented to the entry of a $2,339,000 forfeiture money judgment. PSR ¶ 82. As a result, the home she has lived in for 16 years will be subject to forfeiture. Moreover, restitution for $2,339,000 is also mandatory. On top of these financial obligations, Great American Insurance Company, the insurer that reimbursed Goodwill for its loss, has filed a civil lawsuit against Ms. Joseph in an attempt to recover an additional $2,339,000 on top of the mandatory restitution that will be paid to them as a matter of law. See 18 U.S.C. § 3664(j)(1); PSR ¶ 12.

Despite these dire financial circumstances, Ms. Joseph has promised to disclaim interest in her retirement accounts so the money can be applied toward restitution.[2] Although the funds in her retirement accounts are not proceeds of unlawful activity and thus not subject to forfeiture, Ms. Joseph still wants to do whatever she can to make amends for her crime. Ms. Joseph is deeply ashamed and remorseful for her actions and wants to make things right. *See* Ex. A at 2 (describing Ms. Joseph's "profound sense of guilt, remorse, and shame …").

The loss of Ms. Joseph's professional advancement, compensation, retirement savings, and benefits at the age of 59 is a substantial economic and social punishment. The Court should take into consideration their scope and impact when fashioning her sentence. We respectfully submit that these collateral consequences, which Ms. Joseph lives with every day, diminish the need for imprisonment, especially in light of the substantial forfeiture award that she must separately pay as a result of her conviction. *See* PSR ¶ 82. Just punishment can be achieved instead with a non-incarceratory sentence.

### III. Ms. Joseph's Immediate Acceptance of Responsibility and Demonstrated Rehabilitation on Pretrial Release Weigh in Favor of a Non-Incarceratory Sentence.

Ms. Joseph immediately pled guilty to her crime. Her acceptance of responsibility is consistent with the law-abiding life she has led other than this financial crime. Further, Ms. Joseph has had a spotless pretrial release record for the last 22 months and has not been rearrested. As her childhood friend, Debra Jackman, writes:

> Marcia was known as a smart, caring and conscientious individual within the neighborhood. She could be called upon to assist in resolving issues in an amicable manner. She took on leadership roles in her early years, within and without her family standing firm for what was right even in the face of opposition. Since then, she has continued to be that same kind, caring and supportive person to everyone who comes in contact with her. Extending her knowledge and being compassionate to anyone in need, including myself. There are instances when she helped neighborhood children complete homework assignments which always was accompanied by snacks or some treat.

Exhibit C, Letter of Debra Jackman. Her husband, Bryan James, echoes that sentiment. He writes:

> We met when I was going through some difficulties in my life and from the moment that she agreed to be in a relationship with me, she stood with me and fought with me through everything until my

---

[2] The logistics of withdrawing money from a retirement account before the age of 59 ½ are difficult; Ms. Joseph is not yet 59 ½. I am therefore engaged in discussions with Goodwill and Great American Insurance Company to facilitate the transfer of the funds from Ms. Joseph's retirement account so they can be applied toward restitution, and I will update the Court with any progress made toward that end.

issues were addressed. She has been nothing but kind and attentive to my needs, good with my family and great with my children. She is loyal to a fault, faithful, respectful, caring, kind, compassionate, and I can go on and on…

My wife does things like buying food for hungry beggars, giving the coat off her back to cold strangers then hopping into the car like she did nothing, paying for strangers' groceries, helping to send kids to school and things I cannot remember. She even got me to support a charity, something I had never done before. Her grandmother used to send money to an orphanage and a home for seniors in Guyana once a year before she died, so Marcy donated groceries once each year when she visited. For over a year, she has been cooking for and visiting a relative who is 98 years old, always making sure her relative is comfortable whether she is at home, in the hospital or rehab center. I never met anyone like my wife.

Exhibit D, Letter of Bryan James.

What Ms. Joseph's letters of support make clear is that she is a good person who is deeply remorseful for her actions. Her history and characteristics demonstrate that a sentence of probation is sufficient to satisfy the § 3553(a) factors.

## IV. Due to Ms. Joseph's age and lack of prior criminal history, she is unlikely to reoffend, and a non-incarceratory sentence is therefore sufficient to deter her from future criminal conduct.

This is Ms. Joseph's first conviction. PSR ¶ 29. She therefore has no criminal history category points. *Id.*

The absence of prior convictions indicates that Ms. Joseph is statistically unlikely to reoffend. As the Sentencing Commission has observed, approximately three-quarters of all federal defendants like Ms. Joseph with zero criminal history points do not recidivate. U.S. Sentencing Comm'n, *Recidivism of Federal Offenders Released in 2010* at 26 (Sept. 2021), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf (last visited Aug. 14, 2025). That is by far the lowest rate among people sentenced in federal court. Indeed, even people with one criminal history category point are significantly more likely to reoffend than someone with Ms. Joseph's record. *See id.* (showing that the recidivism rate for one-point criminal history offenders is 42.3%, as compared to 26.8% for zero-point offenders). The absence of prior convictions in Ms. Joseph's past strongly indicates that she does not pose a significant recidivism risk in the future. She does not need imprisonment to be deterred or incapacitated.

Ms. Joseph's recidivism risk is also tempered by her age: she is 59 years old. Robust data establish that aging alone – putting aside the individual factors specific to Ms. Joseph – substantially reduces the risk of reoffending. U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Fed. Offenders* at 23, figs. 13–15 (Dec. 2017), *available at*

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf (last accessed Aug. 14, 2025). According to the Sentencing Commission, rearrest, reconviction, and reincarceration rates are highest for those under 21 years old and between the ages of 21 to 24 years old and decline steadily and substantially with age. *See id*. For example, the recidivism rate for those aged 55 to 59, like Ms. Joseph, is only 22.2%, compared to 66.6% for those aged 21 to 24. *Id*. at 23, Fig. 13.

As the data shows, Ms. Joseph's age significantly reduces her likelihood of recidivism. This, in combination with the absence of prior convictions, supports the conclusion that a sentence below the guidelines can more than adequately deter her from reoffending and constitute just punishment.

### V. A below guidelines sentence is warranted based upon the guidelines' unsound and unreliable emphasis on loss amount, and to avoid unwarranted disparity with similarly situated defendants.

In any sentencing, the court may not presume that the Sentencing Commission's recommended range is reasonable. *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). Skepticism of the guidelines' recommendation is warranted here.

Under U.S.S.G. § 2B1.1, the loss amount is the most determinative factor, by far, in calculating Ms. Joseph's advisory Guidelines range. Here, the total loss attributable to the conspiracy drives the offense level upward by 16 levels. PSR ¶ 17. Courts in this Circuit and nationwide have strongly criticized the Guidelines' use of loss as the main measure of the seriousness of economic crimes. There is a "widespread perception that the loss guideline is broken," *United States v. Corsey,* 723 F.3d 366, 378 (2d Cir. 2013) (Underhill, J. concurring), and "[t]he great weight the Guidelines attached to quantity has been devastatingly criticized, and nowhere explained." Kate Stith, *The Arc of the Pendulum: Judges, Prosecutors, and the Exercise of Discretion*, 117 Yale L.J. 1420, 1476 n.235 (2008) (citations omitted)). "For the small class of defendants convicted of fraud offenses associated with very large guidelines loss calculations, the guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense. Accordingly, the guidelines calculations in such cases are of diminished value to sentencing judges." *Corsey*, 723 F.3d at 380 (Underhill, J., concurring) (internal quotation marks and alterations omitted).

Section 2B1.1 presents two particular problems that make it unsound and unreliable.

*First*, unlike other guidelines, the loss table "was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices." *Corsey*, 723 F.3d at 379 (Underhill, J., concurring) (quoting *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010)). Rather, as one commentator described § 2B1.1's origins, "the Guidelines' 'loss' penalty tables appear to have been created out of whole cloth, without either statutory or empirical basis." Stith, 117 Yale L.J. at 1476 n.235 (citations omitted). Lacking an empirical basis, this guideline "can lead to unreasonable sentences that are inconsistent with what [18 U.S.C.] § 3553(a) requires.'" *Corsey*, 723 F.3d at 379 (Underhill, J., concurring).

Because the Commission failed to rely on national data or experience in promulgating § 2B1.1, the court may conclude that application of this guideline "yields a sentence greater than necessary to achieve § 3553(a)'s purposes." *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007). We respectfully submit that the court should approach this unfounded guideline with that skepticism as other district judges have. For example, Judge Garaufis "refuse[d] to mechanistically impose . . . an illogical sentence" by rote application of the fraud guideline because of "the feeble underpinnings of the loss enhancement," which "is often more or less solely responsible for a white-collar offender's Guidelines sentence." *United States v. Johnson*, 2018 WL 1997975, at *4 (E.D.N.Y. Apr. 27, 2018). Likewise, this Court declined to apply § 2B1.1 in a fraud case because the guideline "mindless[ly] accelerat[es] penalties for economic crimes." *United States v. Faibish*, 2015 WL 4637013, at *2 (E.D.N.Y. Aug. 3, 2015). And Judge Block granted a massive 300-month downward variance from § 2B1.1 because "the Sentencing Guidelines for white-collar crimes [are] a black stain on common sense." *United States v. Parris*, 573 F. Supp. 2d 744, 745, 754 (E.D.N.Y. 2008) (Block, J.). *See also United States v. Black*, 16 cr-370, ECF No. 457 (S.D.N.Y. Oct. 24, 2019) (McMahon, J.) (noting the "utterly ridiculous fraud guidelines chart" is "heavily weighted toward increasing the number of enhancement points" as the loss amount increases, "a fact that has been criticized on more than one occasion by this and other courts"); *United States v. Gajwani*, 16 Cr. 660, ECF No. 50 (S.D.N.Y. Dec. 20, 2017) (Preska, J.) ("[I]n my view the fraud guidelines at the higher financial levels are much more onerous than what is required."); *United States v. Adelson*, 441 F. Supp. 2d 506, 513 (S.D.N.Y. 2006) (Rakoff, J.) (explaining that relying on Guidelines calculations driven mechanistically by loss amounts can produce "utter travesty of justice."), *aff'd* 301 F. App'x 93 (2d Cir. 2008); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.) (condemning "excessive weight" assigned loss amount, "a relatively weak indicator of the moral seriousness of the offense or the need for deterrence").

*Second*, the fraud guideline is structurally unusual. It begins with a low base offense level —here, 7— and "then let[s] the amount of loss . . . become the principal determinant of the adjusted offense level and hence the corresponding sentencing range," an approach "unknown to other sentencing systems." *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016). The Court of Appeals has held that where, as here, "the Commission has assigned a rather low base offense level and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." *Id.* This structural oddity additionally favors the below-guidelines sentence we request.

In recognition that the fraud guideline overstates the appropriate sentence, courts nationwide have tended to impose below-guidelines sentences in fraud cases, especially for defendants, like Ms. Joseph, without prior criminal histories. According to the Sentencing Commission's Judiciary Sentencing Information (JSIN) database, *see* https://jsin.ussc.gov/analytics/saw.dll?Dashboard, in the last five years, district courts have applied U.S.S.G. § 2B1.1 to sentence 675 Criminal History Category I defendants with a total offense level of 20, the parties' stipulated total offense level. Fifty-four percent of these cases resulted in downward departures or variances; only 28% were sentenced within the guideline. If defendants receiving § 5K1.1 departures are omitted from this cohort, the proportion of below guidelines sentences increases to 70%.

Given Ms. Joseph's low likelihood of reoffending, the significant trauma she has experienced, lack of any other convictions, and positive steps toward rehabilitation since her arrest, Ms. Joseph is not one of the minority of Criminal History Category I defendants who merit a guidelines sentence. Rather, she belongs with the majority of similarly situated defendants who are sentenced below the range this unsound and unreliable guideline recommends. A variance avoids unwarranted disparity with this national cohort. *See* 18 U.S.C. § 3553(a)(6) (court must "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").

## VI.     A Non-Incarceratory Sentence is Sufficient to Meet the Goals of Sentencing

Given the full scope of Ms. Joseph's history and characteristics, the § 3553(a) factors point away from the need to incarcerate her to meet the goals of sentencing. Moreover, Ms. Joseph has proven through her actions that she does not need to be deterred or incapacitated by incarceration. Since her arrest for the instant matter almost two years ago, she has not been rearrested, nor has she violated the conditions of her release. Instead, she has shown rehabilitation by promising to apply the funds in her retirement account toward restitution ████████████████████████████ ███████████████████████████████████████.

And so, the only remaining sentencing factor is punishment. As many courts have said, many times, "[i]mprisonment is not the only way we punish." *United States v. Zimmerman*, 2012 WL 3779387 (E.D.N.Y. 2012) (*citing Gall v. United States*, 552 U.S. at 48–49 (2007)). This Court is empowered to sentence Ms. Joseph to an intensive period of probation. Should she violate, the Court would then have the full range of sentencing options – here, twenty years in prison – available as an alternative sentence. Or the Court could sentence Ms. Joseph to supervised release, with any number of special conditions or reporting requirements, including ██████████████. To now remove Ms. Joseph from ████████████████████████ is to weigh pure punishment over every other factor. This is particularly true here, given the professional and financial collateral consequences Ms. Joseph has experienced.

As such, a non-incarceratory sentence of probation with an ongoing forfeiture obligation is enough to punish her for this crime, and we respectfully request that the Court impose such a sentence.

Respectfully submitted,

/s/
_____
Kyla Wells
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
(718) 407-7403
*Counsel for Marcia Joseph*

cc:     AUSA Eric Silverberg (by ECF)
        USPO Nicole Gervase (by email)

# EXHIBIT A
(Filed Under Seal)

# EXHIBIT B
(Filed Under Seal)

EXHIBIT C

March 19, 2025

Hon. Eric N. Vitaliano
United States District Judge
Eastern District of York

Dear Your Honor:

My name is Debra Jackman and I reside in Brooklyn, New York. I am currently employed as a private Caregiver.

It is with deep sincerity that I write this support letter for Marcia Joseph. I have known Marcia for more than forty years. Our acquaintance began from childhood growing up in a small community where everyone knew their neighbor.

Marcia was known as a smart, caring and conscientious individual within the neighborhood. She could be called upon to assist in resolving issues in an amicable manner. She took on leadership roles in her early years, within and without her family standing firm for what was right even in the face of opposition. Since then, she has continued to be that same kind, caring and supportive person to everyone who comes in contact with her. Extending her knowledge and being compassionate to anyone in need, including myself. There are instances when she helped neighborhood children complete homework assignments which always was accompanied by snacks or some other treat.

To Marcia family is everything. Her father was extremely abusive so she developed a very protective attitude towards her mother and siblings. She left her own needs undone so that they could have the things her father, though he could afford, refused to provide since he had two families. After a while, her family started to abuse her weakness. I remember, once she bought a piece of fabric to make a dress for a church function. Her mother could not afford to purchase a dress for one of her sisters so Marcia gave the fabric so that her sister could have a dress made and wore one of her grandmother's dresses instead. Her sister, while wearing the dress laughed at Marcia because she wore an 'old woman's dress'. This has been the pattern of her life for all the time I have known her. Marcia is a person who would walk all the way back to the store if she was given too much change. While she was working at a company in Guyana, she was responsible for millions of dollars in cash and when reconciliations were finished, she accounted for every penny. Nobody even knew she had the keys to the vault till she told us after all the money was handed over.

Of all the people that Marcia helped for all these years, both friends and family, only a handful have stayed in touch. She has been left to face this ordeal with just one sister, three friends, two pastors and her husband who loves her very much. I call her regularly trying to make sure she knows that in spite of the circumstances, I am there for her. It would pain me deeply if she is incarcerated. She is the only person that I can tell my troubles and not hear it again. She listens without judging and provides whatever support

is needed when needed even without being asked. With her being such a trusted friend, I would be destroyed if I cannot communicate with her regularly, exchange views and receive her advice.

Since the arrest, Marcia has been mostly job hunting, though her husband supports her financially right now. She has gone no-contact with most of her family and friends, and intends to seek professional help to deal with any remaining issues related to her childhood and other trauma. We have been discussing the importance of saying 'NO' regardless of what emergency is presented. This experience has taught her that she must never sacrifice herself for the comfort of others to the extent that she places herself in jeopardy and it is alright to be 'selfish', as she was called when she did not want to help.

Marcia has a good heart and over the years she has been manipulated to believe that as the oldest child it was her responsibility to provide for her family. She followed through with this blindly while all of us saw that she was being bullied. I cannot understand how she could not see that her kindness was being abused. I felt like she was a 'sucker for a sad story'. All through our friendship I have seen the pressure she was always under and how she caved in under the stress of the many requests. This must have factored in the choice she made.

Marcia's current needs are simple, her first concern is finding employment. She wants to return to some measure of independence since she has been working from the age of fourteen. She plans to begin investing small amounts that could later be used not only for her future but also to help others. Her heart is set on doing voluntary acts of service not acting under the pressure of others' demands anymore.

Please show her mercy and do not imprison her. Though she has made this grave choice, it is not her nature to be dishonest. She expresses how guilty she feels and how remorseful she is that she took those measures instead of talking to someone when desperation from the pressure was more than she could bear. She has been suffering from insomnia most of her life and it is worse now. Marcia will not repeat this behavior it is not like her to do things like this. That is why I was so surprised when I was told about these events. I promise to stand by her and do whatever is needed to provide support as she has always supported me.

Sincerely,

Debra Jackman

EXHIBIT D

March 12, 2025

Hon. Eric N. Vitaliano
United States District Judge
Eastern District of New York

Dear Your Honor,

I am Bryan James, Marcia Joseph's husband. I am currently a contractor who builds heating and cooling towers for high-rises and other buildings around the City.

Marcy and I met in February of 2018. I was struck by her soft, quiet, laid-back manner in a time when some people are loud always calling attention to themselves.

We met when I was going through some difficulties in my life and from the moment that she agreed to be in a relationship with me, she stood with me and fought with me through everything until my issues were addressed. She has been nothing but kind and attentive to my needs, good with my family and great with my children. She is loyal to a fault, faithful, respectful, caring, kind, compassionate and I can go on and on. Although she is all those things, she will let me know when I am wrong.

Early in our relationship I noticed the demands put upon her and eventually told her I thought she was being used. The calls early in the morning, that woke her up from sleep bothered me because all her family know that she does not sleep well, has severe headaches and her ears would ring for days at a time causing her great discomfort. Seemed to me that every problem was run by her, every bill, hospital visit, activity, anything to do with money was brought to her. There is one particular sister that Marcy helped her for years, long before I came into her life. After a while Marcy talked to her about getting a job which she complained about everyday expecting Marcy to say okay stop working like she did in the past. That sister later got angry with me for 'interfering' and even told me to leave things as I met them and not change anything. My wife took care of her great nephew from birth because her niece wanted to abort him. She would not allow an abortion because she had many miscarriages and still carries the pain from those experiences.

My wife does things like buying food for hungry beggars, giving the coat off her back to cold strangers then hopping into the car like she did nothing, paying for strangers' groceries, helping to send kids to school and things I cannot remember. She even got me to support a charity, something I had never done before. Her grandmother used to send money to an orphanage and a home for seniors in Guyana once a year before she died, so Marcy donated groceries once each year when she visited. For

over a year, she has been cooking for and visiting a relative who is 98 years old, always making sure her relative is comfortable whether she is at home, in the hospital or rehab center. I never met anyone like my wife.

Now that my wife can no longer 'help', most of the people she knew have turned their backs on her. She has a couple of friends who call and two pastors who pray with her to keep her spirits up. At first, she missed the 'crowd' but has since come to terms with this new life that she must live. Her family is very ashamed of her right now so if she is imprisoned, they will probably completely disown her. However, Marcy means the world to me, and I will be devastated if we cannot be together. We are nearly always together. She helps me with everything, since reading and computers are difficult for me, she does all our business. I cannot bear to think about my life without her.

When we first met, she discussed some of the problems she had growing up with an abusive father. The beatings, being told at thirteen that he was not going to support her anymore, wondering how she would survive, being held at gunpoint, not being able to sleep soundly because of fear that her father would actually kill her and or her mother as he promised, the cursing, name calling, denials of basic needs because her father had other interests, etc. and a mother that never fought back. We talked about things she suffered in her previous marriages, why she did not stay with those husbands. She had a hard life and never felt she was truly loved. Somehow, she thought love was the fake smiles and 'thank yous' and 'I love yous' she got when demands were met and always felt driven to please. Everything about her life tells me she gave in to weakness not wickedness and I cannot match this offense to the person that I know and love.

Marcy's main desire right now is to find a job. We are also planning to find a psychologist who specializes in trauma so she can address her issues. Then after we, save a little, she wants to continue to help others but, on her terms, not theirs'. I am here to help prevent the vultures from trapping her again. She learned that she needs to ignore some people's calls, say no, avoid anyone or anything that will play on her heart in a negative way. There is a small group of us who are working with her so that she can rebuild her self-esteem so she will be stronger in the future.

Your Honor, my wife is a good, decent, kind-hearted person who fell to pressures she could not handle. She is not a wicked person; she loves and cares for those around her always putting others before herself but will not repeat this act in the future. Please do not imprison her. I will support and protect her in every way so that she does not recommit this offense. Thank you for your kind consideration of my plea, not only for her sake but also for mine.

Sincerely,
Bryan Jame